NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0493n.06

No. 09-6083

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BUD LEE; CINDY LUNDMAN, as next friend and )
as natural parents of Patrick Lee, deceased, )
                                              )
        Plaintiffs-Appellants,                )
                                              )
v.                                            )
                                              )
METROPOLITAN GOVERNMENT OF )
NASHVILLE AND DAVIDSON COUNTY, )
TENNESSEE; JONATHAN MAYS; JAMIE )
SCRUGGS; CHRISTOPHER BROOKS, )
Individually and in their Official Capacities, )
TASER INTERNATIONAL, INC.; RONALD W.
SERPAS, Chief of Police, Individual and Official
Capacity; JASON CREGAN; PAUL SMITH,
Police Officers, Individually and in their Official
Capacities; JUSTIN PINKELTON, Sergeant,
Individual and Official Capacity; SHARRAFF
MALLERY; JOHN WRIGHT; RYAN SCOTT;
WAYNE FISHER, Police Officers, Individually
and in their Official Capacities,

        Defendants-Appellees.

FILED
JUL 18, 2011
LEONARD GREEN, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

O P I N I O N

BEFORE:    COLE, McKEAGUE, and GRIFFIN, Circuit Judges.

        **McKeague, Circuit Judge.** Patrick Lee was escorted out of a concert and then attempted

to elude arrest by several police officers. In their protracted efforts to subdue Lee, who was under

the influence of drugs, officers used different forms of force, including tasers. Shortly after he was

arrested, Lee became unresponsive and later died. Lee's parents filed the instant suit on his behalf,

alleging that the officers and Nashville violated their son's constitutional rights, and that the taser was a defective product. The district court granted summary judgment in favor of several Defendants, and a jury verdict later absolved the remaining Defendants of liability. Plaintiffs appealed. For the reasons that follow, we **AFFIRM** the orders and judgment of the district court, and we decline to grant Plaintiffs a new trial.

## I. Background

### A. Factual History

On September 22, 2005, Patrick Lee ("Lee") attended a concert at the Mercy Lounge in Nashville, Tennessee. After getting too close to the stage and a performer who was on stilts, Mercy Lounge employees escorted Lee out of the venue. Although the owner and a bouncer were able to get Lee outside, Lee refused to leave the premises and persisted in what can only be described as strange behavior. Eventually, the owner called the Metropolitan Nashville Police Department ("MNPD") for assistance. The first officer to respond was Defendant Christopher Brooks ("Brooks"). Lee approached Brooks's police cruiser, and Brooks got out of the cruiser to speak with Lee. Lee's responses to Brooks's questions were incoherent: Lee said that his name was "Blue" and he would point to the sky when he was asked what was going on. After he asked for Lee's identification, Brooks testified that he felt that Lee invaded his space about three times, and eventually "kind of lunged" at him. Brooks then ordered Lee to place his hands behind his back. Initially, Lee complied with Brooks's orders, but as soon as Brooks grabbed Lee's hands, Brooks testified that Lee then jerked away, ripped his shirt off, spun around, and lunged at Brooks again. Brooks responded by using pepper spray on Lee. Lee then took off running, and Brooks followed.

Lee responded to an order to stop, and got on the ground, but as soon as Brooks approached, he fled again. At some point during the chase, Lee—who had stripped off all of his clothes and was nude—eventually fell down. Brooks attempted to subdue him, only to have Lee escape again. At about the same time, other NMPD officers began responding to a radio call for assistance that was placed by Brooks. The second officer to arrive, Defendant Jonathan Mays ("Mays"), was armed with a Taser X26, which is manufactured by Defendant TASER International, Inc. (TASER). A few seconds later, Defendant Ryan Scott ("Scott") also arrived on scene.

Brooks suggested that Mays use the taser on Lee. After giving several warnings to no avail, Mays deployed the taser for the first time.[1] The taser had the intended effect, and Lee immediately fell to the ground. During the next two minutes Mays recalled activating the taser six more times with little or no effect on Lee. Because many of the taser activations did not incapacitate Lee, it is unclear how many of the activations actually resulted in the taser delivering electricity to Lee. At the same time, Brooks and Scott attempted to gain control of Lee. Brooks testified that he and Scott tried to subdue Lee just a second or two after Lee hit the ground, and that Brooks's arms got tangled up in the taser wires. Scott testified that he asked Mays if he was done applying the taser before he

---

[1]A taser device is typically deployed by pulling a trigger that releases two probes in the direction of the target. The probes are tethered by tiny wires that conduct an electrical charge that is transferred to the target when the probes attach to the person. The shock is designed to incapacitate the person for about five seconds. So long as both probes are attached to the person, the officer may deliver subsequent shocks by pulling the trigger of the device. A shock may also be applied by directly touching an individual with taser, a technique often called a "drive stun."

attempted to subdue Lee because he was concerned about getting shocked.[2] Other witnesses testified that the officers backed away from Lee while he was being tased. The officers had difficulty subduing Lee because he was struggling while naked and sweaty, and Lee also partially moved underneath a car. The officers were able to get a single handcuff onto one of Lee's wrists. Thinking that Lee was under control, Mays removed his taser cartridge. However, Lee broke away from the officers and then ran at Mays who directly administered a brief shock to Lee.

At roughly the same time, more NMPD officers arrived to the scene, including Defendants Jamie Scruggs ("Scruggs"), Wayne Fisher ("Fisher"), John Wright ("Wright"), and Justin Pinkelton ("Pinkelton"). Scruggs, who was also armed with a taser, testified that the first thing that he noticed when he arrived on site was the "loud popping and crackling sound" of taser use. According to Scruggs, his training told him that this was the sound that a taser made when it was activated but did not have a connection with the target. Scruggs first saw Lee running between cars, sweating "profusely," with a single handcuff on. Scruggs further testified that he had never seen someone behaving the way Lee was that evening. Lee came at Scruggs who ordered him to stop, and warned Lee that he would use his taser. The warnings were ignored, and Scruggs activated his taser once Lee was about 3 feet away, incapacitating him. Lee got up again, "almost immediately," and Scruggs deployed the taser a second time, with the intended effect. In what Scruggs described was an effort to "incapacitate him so we could take him into custody," he deployed the taser a third time, to no effect, and Lee ran away again.

---

[2]Apparently, Scott's concern was unwarranted because officers can touch the body of a suspect who is being tased without concern of being shocked.

Mays, who had retrieved a second taser cartridge, came upon Lee, and again deployed his taser after issuing warnings. The probes of the taser struck Lee, but Lee growled and pulled the probes from his body, rather than falling to the ground.[3] Somehow, but without the use of the taser, Lee appears to have gone to the ground again. Scruggs, who had also retrieved a second cartridge, went up to Lee, who was flailing and trying to get up again. Scruggs deployed his taser again, after issuing verbal warnings and commands, because he wanted to give the officers an opportunity to subdue Lee before he got back up. Scruggs testified that Lee fell back to the ground, but "pretty quickly got up" again. Scruggs further testified that he pulled the trigger two more times without effect, but on the next pull the taser worked and Lee fell back, hitting his head on an SUV's step bar. At this point, "[o]fficers moved in very quickly and started to wrestle with him and get him in custody." Still, while the officers were trying to subdue Lee, Scruggs felt that he needed to directly apply the taser two more times, because Lee "was still actively resisting, appeared very strong, [ ] wasn't tired from the previous struggle, and he was very slippery so it was hard for them to get him handcuffed." Following the second direct application of the taser, the officers were able to place the handcuffs on Lee. Three officers, Smith, Mallery, and Cregan, were required to pull Lee's arms together in order to handcuff him.

---

[3]This was the ninth and last time that Mays deployed his taser. The download from the taser indicates that it was deployed one more time, but it appears this was when Mays removed the cartridge and shocked himself. Again, it is unclear how many of these applications actually resulted in the delivery of electricity to Lee's body, and Mays testified that only the first application incapacitated Lee.

Because Lee was still struggling, Cregan placed one knee between Lee's shoulder, and his other knee to Lee's lower back, to keep Lee on the ground. Cregan testified that he thought this was the safest technique for both Lee and the other officers. Cregan further testified that Lee never gave any indication that he was having trouble breathing, and that he was in this position for at least 10 minutes before an ambulance arrived on scene. At roughly the same time as the ambulance arrived, Cregan testified that it seemed like Lee passed out. He could still detect a pulse, but the officers rolled Lee on his back and noticed that his lips were blue. Paramedic Laura Hitchcox ("Hitchcox") responded to the scene and was the first paramedic to see Lee. She testified that she found the officers standing around Lee, who was now on his back, and she noticed that he was not breathing. Hitchcox did not find a pulse and began to administer CPR. Lee was hooked up to a monitor, but the paramedics were not able to employ an electrical shock because Lee's heart was not in a shockable rhythm. Lee was rushed to the hospital and kept on life support until September 23, 2005, at which point the attending doctors declared Lee brain dead. Lee's life support was removed and he died the next day.

An autopsy revealed that Lee had LSD and marijuana in his system at the time of his death. The medical examiner concluded that Lee's death was due to "excited delirium," which is a cardiorespiratory event that can occur to someone suffering from substance abuse who went through a long physical struggle. The autopsy also revealed that Lee had a severely aciodic blood level, but the medical examiner explained that the aciodic blood level was not the cause of death because it occurred after the cardiorespiratory event. Plaintiffs' medical experts suggest instead that Lee died

from metabolic acidosis, which, they argue, could have been caused by taser-induced muscle contractions coupled with a deprivation of oxygen due to Cregan's weight on Lee's chest cavity.

## B. Procedural History

Bud Lee and Cindy Lundman, Lee's parents, brought the present action as next friends in state court on January 27, 2005. The complaint alleged various product-liability claims under Tennessee tort law against TASER, and other state-law claims against the Defendants Officers and the Metropolitan Government of Nashville and Davidson County ("Nashville"). Additionally, Plaintiffs brought claims of excessive use of force under 42 U.S.C. § 1983 against the Defendant Officers, and a § 1983 failure to train claim against Nashville. Defendants removed the case to federal court on February 10, 2006, and the district court later dismissed several of the state-law claims that were brought against Nashville after deciding that they should be litigated in state court. *Lee v. Metro. Gov. of Nashville and Davidson Cnty.*, No. 3:06-0108, 2008 WL 501327, at *5 (M.D. Tenn. Feb. 21, 2008).

Prior to the case going to trial, the district court issued several orders that are relevant to the questions presented on appeal. On January 27, 2009, the district court granted summary judgment to TASER, finding that Plaintiffs failed to present sufficient evidence to show that the Taser X26 was defective, or that TASER had failed to warn about the dangers of excessive taser use. *Lee v. Metro. Gov. of Nashville and Davidson Cnty.*, 596 F.Supp. 2d 1101, 1126 (M.D. Tenn. 2009). In the same order, the district court granted summary judgment to seven Defendant Officers (Fisher, Pinkelton, Scott, Wright, Brooks, Mallery and Smith), finding that the force used by those officers was not excessive as a matter of law. *Id*. at 1116. Furthermore, the district court held that those

officers could not be held liable for failing to intervene in any use of excessive force against Lee. *Id*. at n.8. The remaining state-law battery claims and § 1983 excessive force claims against Mays, Scruggs and Cregan, and the § 1983 failure to train claim against Nashville, proceeded to a jury trial. Late in the trial, Plaintiffs abandoned the battery claim. R. 643, Trial Tr., at 2916. Then, after a 15-day trial, the jury returned a verdict in favor of Mays, Scruggs, and Cregan, finding that the Defendant Officers did not use excessive force on Lee. The jury did not render a verdict on the § 1983 failure to train claim against Nashville because the jury instructions prohibited the jury from considering the claim if the jury did not first find that one of the Defendant Officers used excessive force on Lee. This appeal followed.

## II. Analysis

Plaintiffs have appealed a number of issues related to the district court's grant of summary judgment to TASER and several Defendant Officers, and the trial. We will proceed through these issues in turn, beginning with the grants of summary judgment.

### A. Summary Judgment

Plaintiffs appeal the district court's grant of summary judgment to TASER and Defendant Officers Fisher, Pinkelton, Scott, Wright, Mallery, Smith and Brooks. We conduct *de novo* review of a district court's decision to grant summary judgment. *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)). The moving party initially bears the

burden of showing the absence of any genuine issues of material fact, but once the movant has satisfied that burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks and citation omitted). The nonmovant must, however, "do more than simply show that there is some metaphysical doubt as to the material facts," *id*. at 586, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a "genuine" dispute, *Henderson v. Walled Lake Consol. Schs*, 469 F.3d 479, 487 (6th Cir. 2006). We will address the two grants of summary judgment in turn.

**1. The Defendant Officers**

The district court granted summary judgment to Fisher, Pinkelton, Scott, Wright, Mallery, Smith and Brooks after finding that none of these officers used any amount of force on Lee that rose to the level of excessive force. *Lee*, 596 F. Supp. 2d at 1116. On appeal, Plaintiffs do not argue that any one of these Defendants used excessive force, instead, they argue that summary judgment was inappropriate because the officers could still have been liable for failing to prevent the use of excessive force against Lee. It is indeed possible to hold a police officer liable under § 1983 for failing to act to prevent the use of force when certain circumstances are met, *see, e.g., Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006), but that presupposes that another officer used excessive force against the claimant. Here, the jury found that none of the other officers (Mays, Scruggs or Cregan) used excessive force against Lee and, as will be seen in Part II.C. *infra*, we decline to disturb that finding. Because we may affirm the district court's grant of summary judgment on grounds other

than those employed by the district court, *see Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 n.2 (6th Cir. 2008), and because the jury's verdict forecloses holding these officers liable for failing to act, we **AFFIRM** the district court's grant of summary judgment as to these Defendants.

**2. TASER**

The district court, after finding that Plaintiffs had abandoned several of their claims against TASER, granted summary judgment to TASER on Plaintiffs' claims for negligence and strict products liability. Plaintiffs have only appealed the grant of summary judgment on the product liability claim, which is governed by the Tennessee Products Liability Act. *See* Tenn. Code Ann. § 29-28-102(6). Plaintiffs' claim is that warnings issued by TASER failed to identify the scope of the danger and harm that could result from the repeated use of the taser on a subject. To establish a product-liability claim under an inadequate-warning theory, the plaintiff must show that (1) the warning was inadequate; (2) the product was rendered unreasonably dangerous because of the inadequate warning; and (3) the inadequate warning proximately caused the claimed injury. *See Barnes v. Kerr Corp.*, 418 F.3d 583, 590 (6th Cir. 2005) (citation omitted). The Tennessee Supreme Court has provided several factors for determining whether a product's warning is adequate: (1) whether the warning adequately indicated the scope of the danger of the product; (2) whether the warning communicated the seriousness of the harm that could result from misuse of the product; (3) whether the physical aspects of the warning would alert a reasonably prudent person to the danger; (4) whether the warning is a simple directive that fails to indicate the consequences that might follow from a failure to heed the warning; and (5) whether the means to convey the warning were appropriate. *Id*. (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn. 1994)).

The warning at issue was sent by TASER on June 28, 2005—less than three months prior

to the incident at issue in the instant litigation—to the NMPD on the subject of "Restraint During

TASER System Application." R. 347-10, Training Bulletin, at 1. The bulletin was issued as a result

of TASER's belief "that there may be a training issue where arrest teams are avoiding touching the

subject during the TASER device application." *Id*. The one-page bulletin contained five numbered

points, including in relevant part:

> 1. It is important to emphasize that arrest teams can handle the subject during a TASER device application. Failure to begin restraint procedures during a TASER device application can unnecessarily prolong the duration or number of TASER device applications administered to a given subject.
>
> 2. Repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration, particularly when the probes are placed across the chest or diaphragm. Users should avoid prolonged, extended, uninterrupted discharges or extensive multiple charges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period.
>
> 3. Particularly when dealing with persons showing symptoms of excited delirium, use of the TASER system should be combined with physical restraint techniques to minimize the total duration of the struggle and minimize the total duration of TASER system stimulation. Excited delirium is a potentially fatal condition caused by a complex set of physiological conditions including over-exertion of the subject and inability for sufficient respiration to maintain normal blood chemistry. These subjects are at significant and potentially fatal health risks from further prolonged exertion and/or impaired breathing.

*Id*. TASER concluded the bulletin as follows: "Please distribute this bulletin and the attached

warnings to all TASER device operators within your agency." *Id*. The "attached warnings" were

the updated overall warnings about the TASER device, which incorporated the specific warnings that

were contained in the bulletin. *Id*. at 2–3.

In granting summary judgment for TASER, the district court made three findings regarding this claim. First, the court held that TASER's warning was adequate as a matter of law because the bulletin: (1) adequately indicated the scope of the danger; (2) communicated the seriousness of the harm that could result from misuse; (3) would provide an alert to a reasonably prudent person because the format was concise and focused; and (4) the use of a separate and specific bulletin was an appropriate means to convey the warning. *Lee*, 596 F. Supp. 2d at 1128. Furthermore, the court found that Plaintiffs made no attempt to show that the two other elements of the failure to warn claim—that the allegedly defective warning made the product unreasonably dangerous and that the allegedly defective warning proximately caused Lee's—were satisfied. *Id.*

On appeal, Plaintiffs have made the same mistake, focusing their entire argument on whether TASER's warning was adequate as a matter of law, and ignoring the other two elements of the claim. Accordingly, we **AFFIRM** the decision of the district court on the grounds that Plaintiffs have failed to challenge the district court's findings on these two elements, and we decline to reach the question of whether the warning was adequate as a matter of law. *See B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 265 (6th Cir. 2008) (noting that we may affirm a district court's judgment on the basis that the appellant has failed to challenge necessary findings).

**B. Motion to Reopen Discovery**

Plaintiffs argue that the district court erred in denying their motion to reopen discovery based upon the December 2008 release of a Canadian report that found that some tested TASER devices produced a higher amount of electrical current than TASER thought was possible. We review a district court's denial of a motion to reopen discovery for abuse of discretion. *Audi AG v. D'Amato*,

469 F.3d 534, 541 (6th Cir. 2006). In considering a motion to reopen discovery, the court should consider (1) when the moving party learned of the issue that is the subject of discovery; (2) how reopening discovery would affect the ruling below; (3) the length of the previous discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to prior discovery requests. *Id*.

There is no question that Plaintiffs were not dilatory in their effort to reopen discovery because they filed the motion shortly after the report was issued. However, it appears highly unlikely that the report would have affected the ruling below. First, as the district court noted, the electrical output examined in the study was based on the electrical pulse that is created to discharge the taser, which is not the same as the electrical pulse that is generated when the taser is actually applied to the human body. *See Lee*, 596 F. Supp. 2d at 1129. Thus, it appears that the report did not have any relevance to the question of how much electricity might have passed into Lee's body. Second, as the district court also noted, there are reasons to question the credibility and reliability of the report. The report involved a small sample size of taser devices, and the report was not peer reviewed. *Id*. Moreover, two of the three signatories to the study have done research on behalf of TASER's chief competitor. *Id*. at 1130. Faced with the possible irrelevance of the study, Plaintiffs have not pointed to a particular aspect of the district court's ruling that was incorrect, nor have they explained how additional discovery would have impacted the district court's grant of summary judgment to TASER. Accordingly, we find that the district court had a sound basis for denying the motion to reopen discovery and did not abuse its discretion.

**C. Trial Issues**

**1. Evidentiary Issues**

Plaintiffs argue that a new trial is warranted because the district made several erroneous evidentiary rulings. We review a district court's rulings for abuse of discretion. *Nolan v. Memphis City Schs.*, 589 F.3d 257, 264 (6th Cir. 2009). An abuse of discretion occurs if we are left with the "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where the trial court improperly applies the law or uses an erroneous legal standard." *Paschal v. Flagstar Bank*, 295 F.3d 565, 576–77 (6th Cir. 2002) (citation, internal quotation marks and alteration omitted). "'Broad discretion is given to the district courts in determinations of admissibility . . . and those decisions will not be lightly overturned.'" *Nolan*, 589 F.3d at 265 (quoting *Tompkin v. Phillip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004)). Furthermore, even if the district court's evidentiary ruling was erroneous, we will not grant a new trial if the ruling constituted harmless error. *Id*. at 264–65 (citation omitted).

Plaintiffs challenge three evidentiary rulings: (1) the admission of evidence regarding Lee's criminal record; (2) the admission of evidence of Lee's use of illegal drugs; and (3) the admission of evidence that Lee may have had hallucinogenic mushrooms in his stool at the time of his death. Plaintiffs do not argue that the district court applied the incorrect legal standard in admitting this evidence. Instead, Plaintiffs contend that the district court erred in its application of Fed. R. Evid. 403 ("Rule 403"), which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or  by considerations of undue delay, waste of time, or needless presentation of

cumulative evidence."  "[E]vidence which tends to suggest a decision on an improper basis" can

create unfair prejudice.  *Paschal*, 295 F.3d at 579 (citation and internal quotation marks omitted).

In the particular context of examining a district court's Rule 403 decision, we "'look at the evidence

in a light most favorable to its proponent, maximizing its probative value and minimizing its

prejudicial effect.'" *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (quoting *United States

v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)).

     ***Lee's History of Criminal Behavior and Drug Usage.***  Plaintiffs contend that the following

evidence regarding Lee's history of criminal behavior and drug use should have been excluded: (1)

that Lee went to jail for a failed drug test and earned his G.E.D. while he was in jail; (2) that just

prior to his death, Lee was arrested for a D.U.I and trafficking and possession of various controlled

substances; and (3) that Lee had a history of using various illegal drugs.  Plaintiffs correctly concede

that this evidence was relevant to the pecuniary value of Lee's life, which, under Tennessee law, is

"based upon consideration of (a) the life expectancy of the deceased; (b) his age, condition of health,

and strength; (c) his capacity for earning money through any skill, and any art, trade or profession;

and (d) his personal habits as to sobriety and industry." *Buziashvili v. Inman*, 106 F.3d 709, 716 (6th

Cir. 1997) (citing *Davidson Benedict Co. v. Severson*, 72 S.W. 967, 977 (Tenn. 1903)).  Criminal

history is certainly relevant to this inquiry, and at least one Tennessee court has held that criminal

history is so reflective of a decedent's ability to honestly earn a livelihood that it was *reversible error*

to exclude such evidence. *See Hensley v. Garbin*, 782 S.W.2d 480, 481 (Tenn. Ct. App. 1989).  Still,

Plaintiffs contend that the district court should not have admitted this evidence because it was unduly prejudicial and cumulative.

At trial, the pecuniary value of Lee's life was an issue that was actively litigated. For example, during opening statements Plaintiffs argued that the evidence would show that Lee was a hard worker and person of good character who was using drugs "recreationally." Furthermore, Plaintiffs argued that Lee was on track to have a successful career as a master carpenter or audio engineer, and Plaintiffs introduced the testimony of an economist to establish Lee's future earning potential. Evidence that Lee abused drugs and was recently involved in serious criminal behavior was certainly probative as to whether Lee's ability to honestly earn a livelihood was diminished. While it is true that such evidence cast Lee in a negative light, the district court sought to minimize the prejudicial effect of this evidence in two ways. First, the district court excluded some of the evidence regarding Lee's recent arrest, including documentary evidence and statements made by Lee during the arrest, as well as the fact that he was indicted and facing charges. R. 642, Tr. Trans., at 2749–50. Second, following the most damaging testimony, the district court gave a limiting instruction to the jury: "Members of the jury, at this point I want to give you a limiting instruction. This information is being admitted only as it may be relevant to the pecuniary value of Mr. Lee's life." *Id*. at 2770–71. This instruction minimized the potential prejudicial effect of the evidence. *See United States v. Talley*, 164 F.3d 989, 1000 (6th Cir. 1999). If, for example, the parties had disputed whether Lee was under the influence of drugs at the time of this evidence, then perhaps we could see how this evidence might have prejudiced the jury's determination of that question. But, the parties do not dispute that Lee was under the influence of drugs, and we do not see any way in

which this evidence might have affected the outcome of the trial. For these reasons, we find that the district court did not abuse its discretion in admitting the evidence of Lee's criminal history and past drug use.

***Dr. Guillamondegui's Testimony.*** Plaintiffs also object to an aspect of the testimony of Dr. Oscar Guillamondegui, one of the physicians who attended to Lee after he was admitted to the hospital. Specifically, Dr. Guillamondegui testified that he noticed unusual long-stemmed mushrooms in Lee's stool that looked like hallucinogenic mushrooms. R. 641, Trial Tr., at 2505–07. Furthermore, Dr. Guillamondegui testified that based on his observation he ordered toxicology tests to be performed on the stool, but the tests were never completed because Lee passed away. *Id*. at 2506–07. First, with regard to whether this testimony was speculative, Dr. Guillamondegui's testimony fit within the guidelines of Fed. R. Evid. 701, which provides that a lay witness may testify on those opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge . . ." Dr. Guillamondegui specifically noted that his testimony on this issue was based on his personal experience and not on the basis of his medical expertise.

This testimony had probative value as further evidence of Lee's history of drug use, and also as evidence of Lee's possible drug use immediately before the incident. Moreover, any prejudicial effect of this testimony was minimized by Dr. Guillamondegui's admission that he was not an expert on the matter, Plaintiffs' opportunity to cross-examine Dr. Guillamondegui, and the expert testimony offered by Plaintiffs' own witnesses that the mushrooms seen by the doctor could not have been

hallucinogenic mushrooms. Furthermore, even if the jury gave undue weight to this lay testimony because the witness was a doctor, it is difficult to see how it could have affected the outcome of the trial because it was already undisputed that Lee was on hallucinogenic drugs at the time of the incident. Thus, even assuming that the admission of this evidence was prejudicial, it was still harmless error, and accordingly, we find that the district court did not err in admitting this testimony.

**2. Closing Argument**

Plaintiffs also argue that Defense counsel made inappropriate statements regarding Lee's history of criminal activity and drug use during closing arguments. To be granted a new trial on this ground, Plaintiffs "must show both that the closing argument was improper and that [they were] prejudiced by the impropriety, that is, that there is a reasonable probability that the jury's verdict was influenced by the improper argument." *Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004). Furthermore, where the party failed to object to the closing argument, this Court places a more substantial burden of showing prejudice on the party seeking a new trial. *Id.* (citing *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998)).

Most of the statements made by Defense counsel were simply accurate representations of the trial testimony that was admitted regarding Lee's history of criminal activity and drug use. Further, our review of the transcript shows that Defense counsel was using the testimony for the purpose rebutting Plaintiffs' arguments regarding the pecuniary value of Lee's life:

> So you must decide whether or not you find more credible the fantasy of [the expert witness] as to this bright, responsible everyday working person who was going to earn all of this money legally through his blood, sweat and tears, or whether or not you were really dealing with someone else, because you heard testimony from at least

> two people in this courtroom who have also said that they purchased drugs from him
> . . . .

R. 644, Trial Tr., at 3343–44.  The only portion of the closing argument that we find troubling is that

Defense counsel suggested once that Lee was a "trafficker" of drugs. *Id*. at 3343.  There was some

evidence that Lee had been cultivating drugs and selling them to friends and family, but it does not

appear that there was evidence that Lee's drug selling activity went beyond that, as the "trafficker"

label suggests.  Still, assuming for a moment that this statement was improper, Plaintiffs did not

object to it, and they cannot show that they suffered substantial prejudice as a result of the comment.

It can hardly be said that there is a reasonable probability that this single instance of exaggeration,

during a lengthy trial, would have influenced the jury's verdict, particularly when the comment was

unrelated to the question of whether excessive force was used.  Furthermore, any prejudice that

might have resulted from this statement would have been minimized by the court's instruction to the

jury: "Evidence does not include any statement of the attorneys during the trial, including closing

arguments.  You must decide for yourself whether you believe the facts show what the attorneys have

argued they show."  R. 590, Jury Inst., at 6.  Because Plaintiffs cannot demonstrate plain error, we

find that this statement does not warrant granting a new trial.

### 3. Preponderance of the Evidence

Plaintiffs request that this Court grant a new trial because the verdict returned by the jury in

favor of Mays, Scruggs, and Cregan was against the clear weight of the credible evidence.  Plaintiffs

made a similar argument below, in their motion for a new trial, preserving this issue for appeal.  We

review a district court's decision to deny a new trial on the basis of the weight of the evidence for

abuse of discretion. *Barnes v. City of Cincinnati*, 401 F.3d 729, 743 (6th Cir. 2005). "'In ruling on a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence.'" *Id.* (citing *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991)).

Plaintiffs argue that the district court abused its discretion in denying the motion for a new trial because the district court declined to make credibility determinations regarding the testimony of various witnesses. In considering Plaintiffs' weight of the evidence arguments, the district court considered the reasonableness of three conclusions: (1) whether the jury could have reasonably determined that Mays's use of the taser was not an excessive use of force; (2) whether the jury could have reasonably determined that Scruggs's use of the taser was not an excessive use of force; and (3) whether the jury could have reasonably determined that Cregan did not use excessive force. In analyzing each of these conclusions, the district court considered the evidence proffered by both parties, and specifically noted that both parties offered compelling evidence. *See Lee v. Metro. Govt. of Nashville*, No. 3:06-0108, 2009 WL 2462209, at *6–10 (M.D. Tenn. Aug. 10, 2009). Ultimately, as to each conclusion, because there was compelling evidence in both directions, the district court reasoned that the jury must have afforded more credibility to the testimony of the police officers. The district court declined to remake those credibility determinations.

Plaintiffs' contention that the district should have reconsidered the credibility of the witnesses relies on a misunderstanding of our precedents. The purpose of allowing the district court to reexamine the evidence in considering a motion for a new trial is to ensure that the jury did not

return a verdict that has little or no basis in the evidence presented at trial. But where there was probative evidence presented to the jury that supports the jury's ultimate verdict, it is not within the province of the court to overturn the jury's decision to accept that evidence. In other words, "[a] verdict is not unreasonable merely because other inferences or conclusions could have been drawn or because other results are more reasonable." *Nolan*, 589 F.3d at 264. Moreover, "'[w]itness credibility is solely within the jury's province, and this court may not remake credibility determinations.'" *McDonald v. Petree*, 409 F.3d 724, 731 (6th Cir. 2005) (quoting *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 343 (6th Cir. 1993)); *see also Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir. 1996) (noting that a trial judge may not "substitute[] his judgment of the facts and the credibility of the witnesses for that of the jury"). Accordingly, the district court's decision to decline to remake credibility determinations was proper, and certainly not an abuse of discretion.

Plaintiffs also refer this court to arguments made at the district court by reference in the appellate brief. This Court has expressly held that this practice is not permitted and, therefore, we decline to address those arguments. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 453 (6th Cir. 2003) ("[W]e join the many circuits that have explicitly disallowed the incorporation by reference into appellate briefs of documents and pleadings filed in the district court.").

For all of these reasons, we **AFFIRM** these decisions of the district court, and we decline to overturn the jury's verdict in favor of Mays, Scruggs and Cregan.

**D. The Jury Instructions and Municipality Liability**

Plaintiffs also contend that a new trial is warranted because the jury instructions should have allowed the jury to consider whether Nashville was liable for failing to train the Defendant Officers under the theory that the collective actions and inactions of the officers resulted in the use of excessive force against Lee, even if no individual officer was found to have used excessive force.

We review a district court's jury instructions for abuse of discretion. *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 536 (6th Cir. 2008). The "inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with sound basis in law with which to reach a conclusion." *Pivnick v. White, Getgey & Meyer Co., LPA*, 552 F.3d 479, 488 (6th Cir. 2009) (citation omitted). However, even erroneous instructions do not require reversal unless the instructions are "confusing, misleading, *and* prejudicial." *Id*. (emphasis added). Thus, we will "'not reverse a decision on the basis of an erroneous jury instruction where the error is harmless.'" *Id*. (quoting *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000)). Rule 51 of the Federal Rule of Civil Procedure governs jury instructions, objections and errors. Generally, a party may only assign an error in two instances: "(A) an error in an instruction actually given, if that party properly objected; or (B) a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." Fed. R. Civ. P. 51(d)(1). If the issue was not preserved in one of those two ways, we have the discretion to consider plain errors that affect the substantial rights of the party. *See* Fed. R. Civ. P. 51(d)(2); *see also Alsobrook v. UPS Ground Freight, Inc.*, 352 F. App'x 1, 2 (6th Cir. 2009) (noting that our review

of plain errors in jury instructions is discretionary). Plain error review is a "very high standard," and the appellant has the burden to demonstrate plain error. *Alsobrook*, 352 F. App'x at 2–3 (citations omitted). Moreover, the advisory committee's note to Rule 51 suggests that "the plain error standard is less likely to be met in civil cases than in criminal cases." *Id*. at 3 (citing Fed. R. Civ. P. 51 advisory committee's note (2003)). If plain error does exist, we then "'examine the proceedings in their entirety in the light of the proofs at trial, to determine whether the errors affected substantial rights,'" such that a new trial is warranted. *Id*. at 3 (quoting *Rush v. Ill. Cent. R.R.*, 399 F.3d 705, 715 (6th Cir. 2005)).

Before delving into Plaintiffs' alleged error, it is necessary to briefly discuss § 1983 municipality liability. The question of whether a municipality is liable under § 1983 has two parts: "(1) whether [the] plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) (citations omitted). Thus, under part one of the inquiry, a municipality cannot be held liable under § 1983 "based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2005) ("In fact, because the jury found no constitutional violation . . . the county could not have been found liable. . . for an allegedly unconstitutional custom or policy."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."); *Doe v. Sullivan County*, 956 F.2d 545, 554 (6th Cir. 1992) ("*Heller* simply reaffirmed that a determinative issue in § 1983 claims

against municipalities is whether the plaintiff has suffered a deprivation of his constitutional rights.").

If there is an underlying constitutional violation in satisfaction of part one of the inquiry, the Supreme Court has articulated the circumstances under which a municipality may be held liable for that constitutional violation beginning with *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In *Monell*, the Court rejected a *respondeat superior* theory and held that a municipality may only be held liable under § 1983 when an official policy or custom "'causes' an employee to violate another's constitutional rights." *Id*. at 691–92. Regarding a municipality's failure to train employees, the Court later explained that "the inadequacy of police training may serve as the basis for § 1983 [municipality] liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Deliberate indifference," the Court has repeatedly emphasized, "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (citation and alteration omitted). In requiring this stringent standard, the Court has rejected the notion that a negligent training program can create municipality liability, noting that federal courts should generally refrain from "second-guessing municipal employee-training programs." *Canton*, 489 U.S. at 391–92.

With these precepts in mind, we turn to the relevant jury instructions that were issued by the district court in this case. First, regarding the underlying constitutional violation, the instructions required the jury to consider whether Mays, Scruggs or Cregan individually and separately used

- 24 -

excessive force on Lee, prohibiting the jury from considering the collective actions of the officer: "In this case, the Defendant Police Officers did not act in unison, and you must consider separately the actions of each of them. Thus, you may find liability by none of them, or all of them, or any of them individually." R. 590 Jury Instr., at 19. Next, regarding municipality liability under a failure to train theory, the instructions provided: "Your verdict will be for plaintiffs and against defendant [Nashville] only if you find that one or more of the Defendant Police Officers deprived Mr. Lee of a constitutional right by use of excessive force . . . ." *Id*. at 21. Thus, the instructions required that the jury find that at least one of the Defendant Officers (Mays, Scruggs or Cregan) used excessive force against Lee, before the jury could consider whether Nashville should be held liable for a failure to train.

Because the jury found that Mays, Scruggs and Cregan did not use excessive force, the jury was prohibited from considering the liability of Nashville. Our finding that the jury verdict in favor of those officers should stand leaves Plaintiffs searching for another source of an underlying constitutional violation that would allow municipality liability to attach to Nashville. Plaintiffs have responded by attacking the jury instructions, arguing that the jury should have been permitted to find that the collective actions and inactions of the officers resulted in the use of excessive force against Lee, even if no individual officer used excessive force. The gist of this collective action/inaction theory is that each effective taser application incapacitated Lee for approximately 5 seconds, during which the other officers should have taken advantage of this "window of opportunity" to subdue and handcuff Lee. Plaintiffs argue that the officers' repeated failure to take advantage of the window of opportunity resulted in further unnecessary taser applications. Thus, Plaintiffs contend, even if no

one individual police officer used excessive force, their combined actions and inactions—the repeated application of the taser, followed by the failure to take advantage of the window of opportunity—resulted in the use of excessive force against Lee. Plaintiffs have cited to a few cases that support the proposition that the collective actions and inactions of government employees may cause a constitutional violation. *See, e.g., Epps v. Lauderdale County*, 45 F. App'x 332, 335 (6th Cir. 2002) (Cole, J., concurring) ("Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the 'combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.'") (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985)); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002).

The problem with Plaintiffs' alleged error is that Plaintiffs did not advance this collective action/inaction theory at trial. The district court noted that "the first time [Plaintiffs] offer[ed] the notion that the 'collective actions of officers can be the cause of a constitutional injury and form the basis of a municipal claim, even though no individual officer's actions rise to the level of excessive force,'" was in their *reply* to the Defendant's *response* to Plaintiffs' motion for a new trial. *Lee*, 2009 WL 2462209, at *4. Our own review of the record confirms the district court's view. Indeed, Plaintiffs' proposed jury instructions lacked an instruction regarding a collective action/inaction theory of excessive force, R. 578, Lee Jury Instr., at 3–6, and Plaintiffs' proposed special-verdict form only allowed the jury to consider whether Mays, Scruggs, or Cregan—separately and individually—used excessive force on Lee, R. 579, Lee Jury Verdict Form, at 1–3. Likewise, Plaintiffs did not object to the lack of a collective action/inaction instruction at the jury charging

conference, nor did Plaintiffs object to the fact that the jury instructions explicitly prohibited the jury from considering the collective actions of the officers.[4]  Thus, because Plaintiffs failed to preserve this claim of error for appeal, our review "is discretionary, and only for plain error that affected [Plaintiffs'] substantial rights." *Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 442 (6th Cir. 2010) (citing Fed. R. Civ. P. 51(d)(2)).

Under the circumstances of this case, we find that it is appropriate to decline to review Plaintiffs' alleged error.  "The purpose of Rule 51 is to give the district court an opportunity to correct errors in the jury instructions and to lessen the burden on the appellate courts." *Reynolds v. Green*, 184 F.3d 589, 595 (6th Cir. 1999); *see also Preferred RX, Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535, 547 (6th Cir. 1995) (""[T]he basic purpose of Rule 51 [is] to alert the trial judge to potential problem areas so that the jury can be clearly and correctly instructed."").  "This rule was not intended to require pointless formalities, but rather was designed to prevent unnecessary new trials caused by errors in jury instructions that the district court could have corrected if timely

---

[4]Plaintiffs did properly object to another matter, arguing that the jury did not need to find an underlying constitutional violation by Mays, Scruggs, or Cregan before considering whether to hold Nashville liable under a failure-to-train theory. *See Lee*, 2009 WL 2462209, at *3 & n.2.  However, in compliance with Rule 51, we require a party to "distinctly state[] the issue objected to and the ground for that objection," and "a party cannot state one ground for objection during trial and then state a different ground for objection on . . . appeal." *Anchor v. O'Toole*, 94 F.3d 1014, 1020 (6th Cir. 1996) (citation and quotation marks omitted); *see also Eid*, 377 F. App'x at 441 (noting that this Circuit "generally requires formal requests and objections" to jury instructions). Plaintiffs' objection did not include any statement that would resemble a request or objection regarding a collective action/inaction instruction in compliance with Rule 51.  *See* R.643, Trial Tr., at 2917–21.  In sum, Plaintiffs objection on this separate matter will not allow them to escape plain error review.

Furthermore, we note that any suggestion that the jury could have considered whether Nashville was liable on a failure to train theory without first finding an underlying constitutional violation is clearly wrong.  *See Collins*, 503 U.S. at 120.

brought to its attention." *Reynolds*, 184 F.3d at 595. The jury instructions issued in this case represented a rather ordinary theory of municipality liability that was premised on the municipality's failure to train officers who *individually* used excessive force on Lee. Our task on appellate review is to ensure that these instructions had a sound basis in the law as it pertains to the theory advanced by Plaintiffs. *See Pivnick*, 552 F.3d at 488. Plaintiffs—rather than argue that the district court erred with regard to the instructions on the theory that they advanced at trial—assign error and seek a new trial on the basis that they now wish to pursue an additional theory of § 1983 liability. Alleging an error in jury instructions premised on a theory that was not presented to the district court is beyond the basic purpose and scope of Rule 51 and we think that granting a new trial on that basis would be unwise.

Moreover, even if we were to assume that Plaintiffs' claim of error has merit, it likely falls under the doctrine of "invited error." This doctrine "refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Exp. Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) (citation omitted); *see also Ford v. County of Grand Traverse*, 535 F.3d 483, 490–91 (6th Cir. 2008) (explaining the invited-error doctrine). Indeed, we have applied this doctrine when a party requests one jury instruction and then later complains about that very instruction on appeal. *Harvis*, 923 F.2d at 61–62. Here, any alleged error was invited by Plaintiffs' request for jury instructions that only allowed the jury to consider whether an individual officer used excessive force, and the fact that Plaintiffs did not pursue a collective action/inaction theory at trial. *See Lively v. Elkhorn Coal Co.*, 206 F.2d 396, 399 (6th Cir. 1953) (declining to review a claimed error where "[a]ppellant requested no instruction on the

theory of the case which he now urges upon us, took no exception to the failure of the Trial Judge to so instruct the jury, and did not obtain a ruling on such a theory").

Finally, we note that even if the district court committed error here, the error would be harmless and would not affect Plaintiffs substantial rights because we think that the evidence presented by Plaintiffs at trial did not show that Nashville was deliberately indifferent regarding the training of officers on taser use. Plaintiffs argue that the fundamental flaw in Nashville's training program was that the officers "had very little, if any, useful training on . . . how to take a suspect into custody during [t]aser use." Lee Br. at 8. Because of this, Plaintiffs maintain, the assisting officers failed to take advantage of the window of opportunity, which led to unnecessary taser applications, and ultimately, Lee's death. However, the evidence presented at trial shows that Nashville was aware of this problem and took affirmative steps to train their officers accordingly in the months immediately preceding Lee's September 2005 death. First, the Training Bulletin that we discussed in Part II.A.2. *infra*, was sent by the NMPD to all taser officers, including Mays and Scruggs, in June 2005. *See* R. 347-23, Mays Email 'Read Receipt'; R. 347-24, Scruggs Email 'Read Receipt'. Later, on August 26, 2005, the NMPD sent a second email to taser operators that highlighted these issues with even more specificity. R. 347-26, Email to Taser Operators. The email noted that "[i]t cannot be emphasized enough that during the window of opportunity, that officers can go hands on without fear of being incapacitated by touching a suspect undergoing [taser application]." *Id*. at 2. Further, the email specifically instructed taser operators to issue "verbal commands during and after the [taser] application" to other officers to ensure that they "subdue and cuff [the target] without hesitation." *Id*. Plaintiffs' argument is that these emails were inadequate, and that the NMPD should

have conducted hands-on training regarding these issues that included non-taser operators. However, "a plaintiff seeking to establish municipal liability on the theory that [a training program] has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences . . . . A showing of simple or even heightened negligence will not suffice." *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) (citing *Canton*, 489 U.S. at 388–89). These emails show that Nashville did not disregard a known or obvious consequence of the problems associated with officers failing to take advantage of the window of opportunity. If it were true that Nashville should have done more, such as conducting hands-on training, Plaintiffs' allegations might support a finding that Nashville was negligent. But our cases require more. The story might be different if, for example, Plaintiffs had presented evidence that Nashville was aware that officers were continuing to fail to take advantage of the window of opportunity *after* the Summer 2005 training emails were distributed. *See Brown*, 520 U.S. at 407–08 (noting that the continued adherence to a training approach that the municipality knows has failed to prevent tortious conduct be employees may demonstrate deliberate indifference). Upon our own review of the evidence presented at trial, we do not find any evidence that would suggest that Nashville was deliberately indifferent. Thus, any alleged error in the jury instructions would be harmless because Plaintiffs would be unable to prevail on their § 1983 claim against Nashville.

Plaintiffs had ample opportunity to seek a collective action/inaction jury instruction. Unfortunately, the only explanation for their failure to do so appears to be that Plaintiffs did not find

or pursue this theory until after the trial concluded. For all of these reasons, we find that the jury instructions in this case were proper.

### III. Conclusion

For all of these reasons, we **AFFIRM** the orders and judgment of the district court, and we decline to grant Plaintiffs a new trial.