*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0012p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

LEONARD PIVNICK,

                *Plaintiff-Appellant,*

    *v.*

WHITE, GETGEY & MEYER CO., LPA et al.,
                *Defendants-Appellees.*

No. 07-4304

————————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 05-00580—Michael R. Barrett, District Judge.

Argued: December 9, 2008

Decided and Filed: January 12, 2009

Before: GILMAN, SUTTON, and KETHLEDGE, Circuit Judges.

————————————

**COUNSEL**

————————————

**ARGUED:** R. Michael Phebus, F. HARRISON GREEN CO., Cincinnati, Ohio, for
Appellant. Shea W. Conley, REMINGER CO., Lexington, Kentucky, for Appellee.
**ON BRIEF:** R. Michael Phebus, F. Harrison Green, F. HARRISON GREEN CO.,
Cincinnati, Ohio, for Appellant. Shea W. Conley, REMINGER CO., Lexington, Kentucky,
Brian D. Goldwasser, REMINGER CO., Cincinnati, Ohio, for Appellee.

————————————

**OPINION**

————————————

    RONALD LEE GILMAN, Circuit Judge.  This is a legal malpractice case arising
from Leonard Pivnick's purchase of a thoroughbred horse from Fasig-Tipton Company
(FTC) at an auction.  Because Pivnick never paid for the horse, FTC eventually repossessed
and sold the animal at a private sale.  Pivnick argued that the notices he received from FTC
regarding his default and the subsequent resale of the horse were not commercially
reasonable and thus violated Kentucky's version of the Uniform Commercial Code.  He

1

hired the law firm of White, Getgey & Meyer Co., LPA (WGM) to represent him in a suit against FTC, but WGM failed to prosecute the case that it had filed in state court. This caused the case to be dismissed.

Pivnick then sued WGM for legal malpractice in federal court. WGM stipulated to its legal malpractice, but defended on the ground that Pivnick would not have succeeded on the merits in the underlying suit against FTC even if the case had gone forward. The jury returned a verdict in WGM's favor. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

Pivnick purchased a one-year-old thoroughbred horse for $410,000 at an FTC auction in Saratoga Springs, New York in August 1997. Although he repeatedly promised FTC that payment was imminent, Pivnick never paid for the horse. At trial, Pivnick admitted that he did not have sufficient funds to make the payment until January 1998.

The purchase of the horse was subject to a document titled Conditions of Sale, which provided in relevant part as follows:

> NINTH – TITLE AND DELIVERY: Title passes to Buyer at fall of the hammer. . . . Buyer shall immediately present himself to make settlement upon fall of the hammer . . . .
>
> TENTH – CREDIT AND SETTLEMENT: . . . Buyer grants to Auctioneer a Security interest in each horse purchased, . . . to secure payment of the amount of unpaid purchase price, sales tax, and other indebtedness owed by buyer to Auctioneer or Auctioneer's affiliates . . . . Buyer agrees that Auctioneer shall have all rights and remedies of a Secured Party pursuant to the Conditions of Sale and the Uniform Commercial Code or other applicable law.
>
> ELEVENTH – DEFAULTERS: SHOULD BUYER FAIL TO COMPLY IN ANY RESPECT WITH CONDITIONS NINTH AND TENTH ABOVE, THE AUCTIONEER MAY, IN ITS ABSOLUTE DISCRETION, PURSUE ANY REMEDY AVAILABLE AGAINST THE DEFAULTING BUYER, INCLUDING, BUT NOT LIMITED TO, TAKING POSSESSION OF THE HORSE, RESALE OF THE HORSE AT PUBLIC AUCTION OR BY PRIVATE TREATY FOR ACCOUNT OF DEFAULTER. In any case, Buyer shall be liable for any deficiency after charging to Buyer's account all

> costs of maintenance and resale, including, but not limited to, service charges, attorney's fees, costs of litigation, and damages available to Auctioneer by law.

Pivnick acknowledged and agreed to the Conditions of Sale in an Acknowledgment of Purchase form that he signed on August 5, 1997.

On September 4, 1997, Pivnick received a letter from Boyd Browning, FTC's Executive Vice President, advising him that he was in default and that FTC required payment of the purchase price within seven days. In a conversation on the same day, Pivnick orally promised Browning that he would pay for the horse in one or two weeks. Browning sent Pivnick a follow-up letter the following day, stating that if payment was not received by FTC on or before September 18, 1997, FTC "reserved all its rights available per the Conditions of Sale, including taking possession of the horse for the purpose of resale, either at public auction or by private treaty . . . ." The horse was subsequently resold at a private sale on November 6, 1997 for $375,000. Browning informed Pivnick of the sale in a letter dated the same day. After being "broken" and trained for racing, the horse was then sold for $800,000 in late February 1998 at a public sale.

## B.    Procedural history

Pivnick brought suit in state court against FTC in March 1998, seeking consequential damages for the sale of the horse. FTC counterclaimed for the difference between the price that Pivnick had agreed to pay and the price that FTC obtained in the private sale. In June 2001, Pivnick hired WGM as successor counsel in the case. WGM failed to prosecute Pivnick's claims, which resulted in the dismissal of the case by the state court in September 2004. FTC's counterclaim was likewise dismissed.

In September 2005, Pivnick filed suit in federal court against WGM for legal malpractice. WGM stipulated to its legal malpractice, but defended on the ground that Pivnick would not have succeeded in the underlying case against FTC. The trial was originally set for September 10, 2007, but the district court moved the start date to September 12, 2007 due to a scheduling conflict. One of WGM's witnesses, Browning, was available to testify only on September 12, the first day of trial. Over Pivnick's objections, the court permitted Browning to testify out of turn and before Pivnick presented his case.

After Browning testified, Pivnick moved for a mistrial. The record does not show that the court has ever formally ruled on the motion.

Pivnick then presented his case. At the close of his proof, he moved for judgment as a matter of law. The district court denied the motion. Pivnick did not renew his motion at the close of all the evidence. The jury subsequently returned a verdict in WGM's favor. Pivnick then moved to set aside the jury verdict and again for judgment as a matter of law. These motions were denied by the court. This timely appeal followed.

## II. ANALYSIS

### A.    Sufficiency of the notice

#### 1.    *Standard of review*

"In a diversity case such as this, we look to state law for the standard with which to review a denial of [a motion for judgment as a matter of law]." *Nationwide Mut. Fire Ins. Co. v. May*, 860 F.2d 219, 222 (6th Cir. 1988) (citation omitted). Under Kentucky law, the jury's verdict must be upheld if, "draw[ing] all fair and rational inferences from the evidence in favor of the party opposing the motion," the evidence is sufficient to sustain the verdict. *Spivey v. Sheeler*, 514 S.W.2d 667, 673 (Ky. 1974) (citation and internal quotation marks omitted). Kentucky courts thus recognize that "it is the jury's province to weigh the evidence." *Perry v. Ernest R. Hamilton Assocs. Inc.*, 485 S.W.2d 505, 509 (Ky. 1972) (citation and internal quotation marks omitted). Nonetheless, the courts are duty-bound to take a case away from the jury if the evidence does not "present a true issue of fact to the jury." *Wadkins' Adm'x v. Chesapeake & Ohio Ry. Co.*, 298 S.W.2d 7, 9-10 (Ky. 1956).

#### 2.    *Analysis*

Kentucky law applies in this case. Although the sale of the horse took place in New York and WGM raises the argument in its brief that New York law "should provide the framework for analysis of the dispute," the issue as to choice of law has been waived because the parties never disputed that Kentucky law should apply in both the underlying case against FTC and in the present case against WGM. The district court relied upon Kentucky law and quoted Kentucky Revised Statutes Annotated § 355.9-504(3) at length in reaching its decision to deny Pivnick's motion for judgment as a matter of law. At no time

during the lower court proceedings did WGM argue that New York law should apply or object to the district court's reliance upon Kentucky law.

This suit arose under "Old Article 9" of Kentucky's version of the Uniform Commercial Code. Old Article 9 was in effect prior to July 1, 2001, on which date Kentucky adopted the current Revised Article 9. The relevant part of the statute provides as follows:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one (1) or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . . .

Ky. Rev. Stat. Ann. § 355.9-504(3) (West 1999).

Kentucky law is clear that whether a notice from a creditor to a debtor with respect to the disposition of the collateral is "commercially reasonable is a question of fact, not a question of law." *McCoy v. Am. Fid. Bank & Trust Co.*, 715 S.W.2d 228, 230 (Ky. 1986) (internal quotation marks omitted). The Kentucky Supreme Court explained in *McCoy* that

> the purpose of notice is to permit the debtor to bid at the sale or to protect himself from an inadequate sale price by notifying would-be purchasers of the sale. In addition, proper notice allows the debtor to exercise the right of redemption before sale. Exercise of these rights requires sufficient lead time for the debtor to obtain financing for the bid or redemption. The question of whether reasonable notice was sent *is a question of fact*.

*Id.* at 230-31 (citation and internal quotation marks omitted) (emphasis in original). Similarly, the Kentucky Court of Appeals has said that "if there exists a genuine issue of material fact as to the commercial reasonableness of the notice, this will be for a jury to decide." *Ford Motor Credit Co. v. Hall*, 879 S.W.2d 487, 490 (Ky. Ct. App. 1994).

Pivnick argues that the district court should have decided as a matter of law that the letters he received from Browning did not constitute commercially reasonable notice. But he has been unable to point to any decision under Kentucky law that supports his contention. He instead relies on two out-of-state cases whose facts are distinguishable from this case.

In both *First National Bank v. DiDomenico* [*DiDomenico*], 487 A.2d 646 (Md. 1985), and *Topeka Datsun Motor Co. v. Stratton*, 736 P.2d 82 (Kan. Ct. App. 1987), the debtor purchased consumer goods on credit, and the goods themselves were used as collateral. When the debtor in each case went into default, the creditor sent the debtor a letter stating that the collateral would be sold in a private sale unless the debtor redeemed the collateral within a certain period of time. The collateral was then sold sometime after the stated time period, and the creditor brought suit against the debtor for a deficiency judgment. Both courts held that the creditor had misstated the redemption rights of the debtor, impermissibly shortening the redemption period as allowed by law. The two courts therefore concluded, as a matter of law, that the notice sent by the creditor was commercially unreasonable. *DiDomenico*, 487 A.2d at 648-49; *Topeka Datsun Motor*, 736 P.2d at 89.

In contrast to the misstated right of redemption in the two cases cited above, the letters sent by Browning on September 4 and 5 of 1997 contain no language regarding Pivnick's redemption rights. Indeed, the words "redeem" and "redemption" were never used. These letters instead informed Pivnick, in identical language, that FTC "reserves all rights available per the Conditions of Sale, including taking possession of the horse for the purpose of resale, either at public auction or by private treaty." These letters, therefore, cannot be said to "under[take] to present [Pivnick's] redemption rights . . . in a manner which described them to be less favorable to [Pivnick] than they were in law." *See DiDomenico*, 487 A.2d at 648. And even if the cases cited by Pivnick were deemed to provide modest support for his position, we are more persuaded by clear Kentucky law holding that the issue of reasonable notice is properly submitted to the jury.

Contrary to Pivnick's claims, we conclude that the notice from FTC and the subsequent sale of the horse were not commercially unreasonable as a matter of law. The Kentucky Court of Appeals has held that, under the Kentucky Uniform Commercial Code, "the creditor may dispose of the collateral by a public or private sale." *Ford Motor Credit Co.*, 879 S.W.2d at 489. The court went on to say:

> In the event that the property is sold at a public sale, the statute requires that the debtor be given reasonable notice of the time and place of the public sale. If the creditor intends to conduct a private sale, the statute requires that the debtor be given reasonable notification of the time after which the creditor will dispose of the property.

*Id*. at 489 (citations omitted). According to this language, the creditor need not inform the debtor of the specific time and place of the private sale, only "a specific date after which the creditor may proceed to dispose of the collateral." *Nelson v. Monarch Inv. Plan, Inc.*, 452 S.W.2d 375, 377 (Ky. 1970). Doing so "would give the debtor a deadline within which to protect himself in whatever manner he saw fit." *Id.*

The September 5, 1997 letter that FTC sent to Pivnick stated that "[i]f the account is not settled in full on or before September 18, 1997 with payment received by [FTC,] . . . [FTC] reserves all rights available per the Conditions of Sale, including taking possession of the horse for the purpose of resale, either at public auction or by private treaty . . . ." This language put Pivnick on notice of the "time after which a private sale properly could be made" so that he could "protect himself in whatever manner he saw fit." *See id.* at 377, 378 (respectively).

Furthermore, even if we were to conclude that FTC's notice was unreasonable as a matter of law, Pivnick would still not have prevailed because he cannot show that the allegedly unreasonable notice caused any damage to him. Pivnick testified at trial that he did not have the requisite funds to pay for the horse until January 1998, more than five months after the auction and two months after the private resale of the horse. On appeal, Pivnick argued that, had he known about the resale of the horse, he would have taken steps to liquidate assets or worked to ensure that the resale was commercially reasonable. But Pivnick put forth no specific evidence as to which assets he would have liquidated. He also failed to proffer any evidence that the resale of the horse was commercially unreasonable. Pivnick has thus been unable to show that the allegedly unreasonable notice by FTC resulted in any damage to him.

In short, we find that, under Kentucky law, the issue of whether the notice given by FTC was commercially reasonable was an issue of fact properly submitted to the jury to decide. We also conclude that, based on the evidence submitted, a rational factfinder could have found that the notice was reasonable. Alternatively, we find that the notice did not cause Pivnick any harm. We therefore reject Pivnick's challenge to the allegedly deficient notice given by FTC.

**B.        Jury instructions**

### 1.       *Standard of review*

Jury instructions are considered "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 263 (6th Cir. 2000) (citation and internal quotation marks omitted). "Because the correctness of jury instructions is a question of law," we review them de novo. *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir. 1998).

### 2.       *Instructions regarding burden of proof*

Pivnick argues that the district court erred in instructing the jury that he "ha[d] the burden to show, by a preponderance of the evidence, that any one aspect of the sale by [FTC] was not commercially reasonable . . . ." According to Pivnick, he would not have had the burden of proving commercial unreasonableness in the underlying case against FTC, and therefore should not have been required to prove the same in the legal malpractice case against WGM.

Under Kentucky law, a plaintiff in a legal malpractice case has the burden of proving

> (1) that there was an employment relationship with the defendant/attorney; (2) that the attorney neglected his duty to exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances; and (3) that the attorney's negligence was the proximate cause of damage to the client.

*Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003) (citation and internal quotation marks omitted). The Kentucky Supreme Court noted that a legal malpractice case is essentially a "suit within a suit." *Id.* (citation and internal quotation marks omitted). "To prove that the negligence of the attorney caused the plaintiff harm, the plaintiff must show that he/she would have fared better in the underlying claim; that is, but for the attorney's negligence, the plaintiff would have been more likely successful." *Id.* In the present case, WGM admitted that Pivnick had established the first and second elements of his malpractice claim. The crucial question is whether Pivnick was able to show a likelihood of success in the underlying case against FTC.

Pivnick argues that FTC, as the secured creditor in the underlying suit, would have had the burden of proving that the notice it gave and the eventual sale were commercially reasonable. He thus contends that the district court erred in instructing the jury otherwise. In so arguing, Pivnick relies on language from *Bank of Josephine v. Conn*, 599 S.W.2d 773 (Ky. Ct. App. 1980), and *Bailey v. Navistar Financial Corp.*, 709 S.W.2d 841 (Ky. Ct. App. 1986). Neither of those cases, however, fits the situation here. In both cases, the creditor was the plaintiff bringing suit against the debtor for a deficiency judgment. As plaintiffs, they bore the burden "to prove that the notice was sent in a commercially reasonable manner." *Bailey*, 709 S.W.2d at 843. The *Bank of Josephine* court explicitly limited its holding to the situation in which the creditor was the plaintiff, and declined to reach the question of who would bear the burden of proof if the debtor brought suit to recover damages from the creditor. 599 S.W.2d at 774. The court observed that "[h]ad the [debtor] filed an action against the [creditor] under KRS 355.9-506, it is arguable that the burden of proving commercial reasonableness—or in actuality, commercial unreasonableness—should be borne by the [debtor]." *Id.* Having said this, the court then expressly declined to reach that question. *Id.*

We are aware of no Kentucky case that squarely addresses the question of which party should bear the burden of proving commercial reasonableness or unreasonableness when the debtor sues the creditor for consequential damages. But courts in other jurisdictions that have addressed this issue have concluded that where a debtor is suing for damages for failure of the creditor to comply with UCC requirements, the *debtor* bears the burden of proving all elements of the debtor's case. *See, e.g.*, *Adam State Bank v. Navistar Fin. Corp.*, 426 N.W.2d 525, 527 (Neb. 1988) ("[W]here . . . a party is proceeding against the secured party to recover its loss caused by the secured party's failure to dispose of collateral in a commercially reasonable manner under the Uniform Commercial Code, the burden of proof as to commercial reasonableness is on the party seeking to recover such a loss."); *First Nat'l Bank & Trust Co. of Enid v. Holston*, 559 P.2d 440, 444 (Okla. 1976) ("[W]here the debtor proceeds against the secured party to recover his loss caused by a failure by the secured party to proceed pursuant to the UCC, the debtor carries the burden of proof."). A treatise on the Kentucky Uniform Commercial Code comes to the same conclusion. *See* D. Leibson & R. Nowaka, The Uniform Commercial Code of Kentucky 943

(2d ed. 1992) ("In Kentucky, . . . [i]n a nondeficiency situation where the debtor is seeking damages, the burden should be on it to prove that [the] creditor did not proceed in accordance with the article 9 default provisions.").

Based on the above authorities, we believe that the Kentucky Supreme Court would reach the same result. We therefore hold that the district court properly instructed the jury that Pivnick bore the burden of proving that either the notice or the sale was commercially unreasonable.

### 3.	*"May be made" vs. "is to be made"*

Pivnick also argues that the district court improperly instructed the jury that "reasonable notification of a private sale must include the time after which any sale or other intended disposition *may* be made." (Emphasis added.) The relevant statutory language states that "reasonable notification of the time after which any private sale or other intended disposition *is to be made* shall be sent by the secured party to the debtor . . . ." Ky. Rev. Stat. Ann. § 355.9-504(3) (West 1999) (emphasis added). Pivnick argues that the district court's use of the "may be made" language rather than the "is to be made" language in the jury instructions constitutes reversible error because the "may be made" language "creates a relaxed notice requirement that does not exist."

We disagree. The Kentucky Court of Appeals (the highest court in Kentucky before its name was changed in 1976) has previously used the phrase "may be made" interchangeably with the phrase "is to be made" when interpreting the statutory language in § 355.9-504(3). *See Nelson v. Monarch Inv. Plan of Henderson, Inc.*, 452 S.W.2d 375, 377 (Ky. 1970). In *Nelson*, after quoting the statutory language in § 355.9-504(3), the Court stated that it "construe[s] this provision to mean that the debtor is entitled to notification of a specific date after which the creditor *may* proceed to dispose of the collateral." *Id.* (emphasis added). A few lines later, once again departing from the literal "is to be made" language, the Court decided that the debtor must have received "reasonable notification of a time after which a private sale properly *could* be made." *Id.* at 378 (emphasis added). The Court in *Nelson* seems to be using the terms "may," "could," and "is to be" interchangeably. We therefore conclude that the district court properly relied on valid Kentucky precedent in choosing to use the "may be made" language in the jury instructions.

Moreover, even if we were to conclude that the jury instructions erroneously departed from the statutory language, any such error would be harmless. "Our inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000). The district court's word choices here, even if erroneous, were not so "confusing, misleading, and prejudicial" to the jury as to require reversal. *Id.* We do not believe that the jury would have been so misled or confused by the phrase "may be disposed" rather than "is to be disposed" that a different outcome would have ensued in the trial. This court will "not reverse a decision on the basis of an erroneous jury instruction where the error is harmless." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000).

## C.        Browning's testimony

We now turn to Pivnick's final argument, which concerns the calling of a defense witness out of order. At trial, the district court permitted WGM's witness Browning to testify before Pivnick put on his case because Browning had a scheduling conflict. Pivnick argues that the district court abused its discretion in doing so. He further contends that the court abused its discretion when it denied Pivnick's motion for a mistrial following Browning's testimony. Pivnick claims in his appellate brief that WGM made "misleading statements" when requesting that the district court allow Browning to testify out of turn, and that this "outrageous conduct of counsel" caused him "extreme prejudice."

We review the district court's rulings on trial motions under the abuse-of-discretion standard. *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005). The record shows that WGM's counsel initially planned to use deposition testimony rather than live witnesses, but then decided to call Browning as a live witness the day before the trial was scheduled to begin. Over Pivnick's objections, the trial court granted the request. Based on these facts, Pivnick essentially accused WGM of procuring Browning's unavailability (except on the first day of trial) in bad faith. WGM, however, counters that Browning's name was submitted as a potential live witness in the parties' joint pretrial order, while his deposition was simultaneously designated to be read.

Counsel for WGM explained that they had designated Browning's deposition to be read due to uncertainty that he would be available to testify as a live witness. Browning himself had discussed his scheduling conflict at his deposition. Moreover, the trial transcript shows that, contrary to Pivnick's claims, his counsel learned at least one week prior to trial that WGM might call Browning as a live witness.

The district court's decision to allow Browning to testify out of turn was not an abuse of discretion under these facts. "[A] district court abuses its discretion only when it relies on clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Am. & Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (citation and internal quotation marks omitted). Pivnick does not point to any law that the district court erroneously applied. His only argument is that the district court's decisions to allow Browning to testify out of turn and to deny Pivnick's motion for a mistrial were based on misleading statements made by WGM. The record does not support such a factual finding.

Moreover, Pivnick cannot show that he suffered any prejudice as a result of Browning's testimony. He had ample opportunity during trial to cross-examine Browning and to counteract any alleged "coloring of the case" or "extreme prejudice" that resulted from Browning testifying out of order. We thus find no reversible error on this issue.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.