RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LAKENDUS COLE; LEON EDMOND, individually and as representatives of all others similarly situated,
            *Plaintiffs-Appellees*,

v.

CITY OF MEMPHIS,

            *Defendant-Appellant*.

Nos. 15-5725/5999

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:13-cv-02117—Jon Phipps McCalla, District Judge.

Argued: June 14, 2016

Decided and Filed: October 17, 2016

Before: GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** J. Michael Fletcher, CITY OF MEMPHIS, Memphis, Tennessee, for Appellant. Robert L. J. Spence, Jr., THE SPENCE LAW FIRM, Memphis, Tennessee, for Appellees. **ON BRIEF:** J. Michael Fletcher, Zayid A. Saleem, Barbaralette G. Davis, CITY OF MEMPHIS, Memphis, Tennessee, for Appellant. Robert L. J. Spence, Jr., Bryan M. Meredith, E. Lee Whitwell, THE SPENCE LAW FIRM, Memphis, Tennessee, for Appellees.

        GIBBONS, J., delivered the opinion of the court in which DONALD, J., joined, and GRIFFIN, J., joined in part. GRIFFIN, J. (pp. 16–19), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge. Lakendus Cole, a Memphis police officer, was arrested in the early morning hours of August 26, 2012, shortly after leaving a night club on Beale Street in downtown Memphis, Tennessee. After his arrest, he brought claims individually and on behalf of those similarly situated, alleging that the City's routine practice of sweeping Beale Street at 3 a.m. on weekend nights violated his constitutional right to *intra*state travel. Cole and the class won at trial. The jury found that the City implemented its street-sweeping policy without consideration of whether conditions throughout the Beale Street area posed an existing, imminent, or immediate threat to public safety. Based on the jury's findings, the district court found the policy unconstitutional under strict scrutiny, entered an injunction, and ordered other equitable relief on behalf of the class. The City appeals, arguing that it was error to subject the Beale Street Sweep to strict scrutiny and error to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(2) when the precise members of the class were not ascertainable. The City also argues that there was insufficient evidence to support the jury's findings that the Sweep was the cause of Cole's arrest. For the reasons set forth below, we affirm the district court.

I.

Beale Street is a popular entertainment district in Memphis, consisting of two blocks of restaurants, bars, clubs, and other entertainment venues. The street is typically barricaded on each end, so most traffic is by foot. By Memphis ordinance, vendors may sell, and patrons may carry, alcoholic beverages on the sidewalks and streets when the street is closed to motor traffic. Tenn. Code Ann. § 57-4-102(27)(A)(iv); Memphis Ordinance §§ 7-4-15(C), 7-8-23.

Around 3:30 a.m. on August 26, 2012, Memphis Police Department ("MPD") officers arrested fellow MPD officer Lakendus Cole on Beale Street shortly after he exited a dance club. During the course of arrest, officers pressed Cole against a squad car with enough force to make two dents. Cole was charged with disorderly conduct, resisting stop/arrest, and vandalism over

$500 (a felony). Although the charges were ultimately dropped, the arrest and pending charges resulted in damages to Cole, including loss of secondary employment and reassignment from the MPD's organized crime unit to traffic patrol. He also sought medical treatment from a neurologist for physical injuries.

Cole and another named plaintiff, Leon Edmond,[1] brought a class-action lawsuit. They alleged that the City's routine practice of sweeping Beale Street in the early morning hours was unconstitutional. Plaintiffs defined the "Beale Street Sweep" as:

> [T]he policy, procedure, custom, or practice by which police officers of the [MPD] order all persons to immediately leave the sidewalks and street on Beale Street *when there are no circumstances present which threaten the safety of the public or MPD police officers.*

(DE 88, ID 769 (emphasis added).) They alleged that the Beale Street Sweep "incite[d] violence and create[d] an environment where Memphis police officers involved in this unlawful conduct bec[a]me highly aggressive, agitated, frenetic, and confrontational towards individuals lawfully standing and walking on Beale Street." (DE 1, ID 8−9.) Plaintiffs also brought individual claims for unlawful arrest and excessive force pursuant to 42 U.S.C. § 1983.[2]

The district court certified the following class definition under Federal Rule of Civil Procedure 23(b)(2): "All persons who have been unlawfully removed from Beale Street and/or adjacent sidewalks by City of Memphis police officers pursuant to the custom, policy and practice known as the Beale Street Sweep." (DE 88, ID 780, 805−08.) However, upon the City's motion to decertify or modify the class and before final judgment, the district court revised the definition of the Beale Street Sweep "in order to be more consistent with the strict scrutiny standard that is applied to cases regarding violations of an individual's fundamental rights, such as the fundamental right to intrastate travel." (DE 160, ID 2062.) The court revised the definition of the Beale Street Sweep (embedded in the class definition) as follows:

---

[1]The MPD arrested Edmond on Beale Street on May 5, 2012. At trial, witnesses testified that Edmond appeared to be highly intoxicated and had behaved erratically, which caused the manager of Club 152 to call the police. Ultimately, the jury did not find that the municipal practice caused Edmond's arrest. Edmond does not appeal.

[2]Plaintiffs voluntarily dismissed their claims against the individual officers.

[T]he policy, procedure, custom, or practice by which police officers of the Memphis Police Department order all persons to immediately leave the sidewalks and street on Beale Street *without consideration of whether conditions throughout the Beale Street area pose an existing, imminent or immediate threat to public safety.*

(*Id.* at 2063 (emphasis added).)

In support of its pretrial motions, the City admitted that it had a practice of regularly sweeping Beale Street but argued that it discontinued the practice on or about June 14, 2012. The City also defended the practice as being related to public safety. After a five-day trial, a jury found otherwise. It concluded that the City "carried out a custom and/or well-established practice mainly on weekends at or about 3:00 a.m. of preventing persons from standing and/or walking on the sidewalk or street of Beale Street" prior to *and* on or after June 14, 2012, (DE 141, ID 1899−1900), that the custom was "the cause of persons being prevented from standing and/or walking on the sidewalk or street of Beale Street" (*id.* at 1900), and that the practice occurred "without consideration to whether conditions throughout the [area] pose[d] an existing, imminent or immediate threat to public safety." (*Id.*) Further, the jury found that, since 2007, thousands of persons were cleared pursuant to the practice.

As for Cole, the jury found that the practice was the cause of his arrest, and that on the night of Cole's arrest, conditions on Beale Street did not pose an existing, imminent, or immediate threat to public safety. Cole was awarded $35,000 in compensatory damages for his arrest pursuant to the policy.

After trial, the district court granted plaintiffs' motion for class-wide declaratory and injunctive relief, permanently enjoining the City and its employees from "engaging in 'the Beale Street Sweep' [as previously defined]," but the court specifically noted that the injunction did not "prevent the MPD from conducting normal police work or clearing Beale Street under appropriate circumstances where an imminent threat exists to public safety throughout the Beale Street area." (DE 161, ID 2092−93.) In addition, the court ordered other equitable relief, including officer training and the distribution of bulletins to officers explaining that the practice is unconstitutional. The City timely appeals.

II.

A.

The City first argues that the district court erred in finding that the Beale Street Sweep infringed the fundamental right to intrastate travel and in subjecting the policy to strict scrutiny. In the City's view, the policy does not implicate the right to intrastate travel, and even if it does, the infringement is slight and, therefore, it should be reviewed for a rational basis.

In 2002, we became one of a few circuits to recognize the right to intrastate travel as "fundamental."[3] In *Johnson v. City of Cincinnati*, our court held that the Due Process Clause of the Fourteenth Amendment protects the "right to travel locally through public spaces and roadways." 310 F.3d 484, 495 (6th Cir. 2002). At issue in *Johnson* was a city ordinance that banned individuals arrested for certain drug offenses from entering designated "drug-exclusion zones" (such as Cincinnati's Over the Rhine neighborhood) for up to ninety days. *Id.* at 487–88. The ordinance's exclusion extended for up to one year upon conviction. *Id.* at 488. Two plaintiffs, one of whom was prohibited from entering the neighborhood where her daughter and five minor grandchildren lived, challenged the ordinance as an unconstitutional infringement on their right to "freedom of movement in the form of their right to intrastate travel." *Id.* at 489.

We began by asking whether the right to intrastate travel was "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty," *id.* at 495 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)), and concluded that "the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage." *Johnson*, 310 F.3d at 495−98. We noted:

> Although the Supreme Court has not expressly recognized a fundamental right to intrastate travel, as early as the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments,

---

[3]The First, Second, and Third Circuits have also recognized a fundamental right to intrastate travel. *See Cole v. Hous. Auth. of Newport*, 435 F.2d 807 (1st Cir. 1970); *Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003); *Lutz v. City of York*, 899 F.2d 255 (3d Cir. 1990). Additionally, the Eighth Circuit has affirmed a district court's decision that assumed, without deciding, that a right to intrastate travel existed and laws burdening such rights were subject to intermediate scrutiny. *See Townes v. City of St. Louis*, 112 F.3d 514 (8th Cir. 1997) (per curiam) (unpublished table decision) ("[W]e conclude that the district court's judgment was correct and that an extended discussion is not warranted.").

peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom."

*Id.* at 496–97 (quoting *United States v. Wheeler*, 254 U.S. 281, 293 (1920)).

After concluding that "the right to travel locally through public spaces and roadways" was a "fundamental liberty interest," we considered the appropriate degree of scrutiny. *Id.* at 502. For guidance, we turned to the Third Circuit's decision in *Lutz*, which concerned a challenge to the City's anti-cruising ordinance that prohibited repetitive driving through a few-block portion of downtown York. *Id.* (citing 899 F.2d at 256) The court in *Lutz*, drawing heavily from First Amendment time, place, and manner doctrine, observed that "[n]ot every governmental burden on fundamental rights must survive strict scrutiny" and concluded that "reviewing all infringements on the right to travel under strict scrutiny is just as inappropriate as applying no heightened scrutiny." *Id.* at 269. Just as in the speech context, the "right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases—even on roads specifically designed for public travel" because "[u]nlimited access to public . . . roadways would result not in maximizing individuals' opportunity to engage in protected activity, but chaos." *Id.* To avoid such disorder, state and local governments should be afforded "some degree of flexibility to regulate access to, and use of, the publicly held instrumentalities of . . . travel." *Id.* The court ultimately reviewed the ordinance under intermediate scrutiny, a test the ordinance passed because its scope was limited to a specific location—"a distance of no more than several blocks" that was "undisputedly affected by the current cruising problem"—and left ample alternative routes to travel through town. *Id.* at 270.

The *Johnson* court then compared the ordinance at issue in *Lutz* to Cincinnati's drug-exclusion zone ordinance and concluded that strict scrutiny was the more appropriate standard. 310 F.3d at 502. We noted that, unlike York's anti-cruising rule, the drug-exclusion ordinance did not regulate the time or the manner in which people accessed the Over the Rhine neighborhood. Rather, it broadly prohibited access to the entire neighborhood for an extended period of time—ninety days after a drug arrest and one year after a drug conviction. *Id.* at 494, 502. Our decision to apply strict scrutiny in *Johnson* was based entirely on this cogent difference in the scope of the ordinances, and we were quick to "acknowledge the strength of the

Third Circuit's reasoning" in *Lutz* and noted the possibility that intermediate scrutiny could be applied to a "less severe regulation of localized travel." *Id.* at 502. In a footnote, we cautioned that First Amendment jurisprudence concerning "place" regulations would be difficult to translocate to the travel context because "regulating the place of speech does not foreclose speech or association in the same way as regulating the place of travel might." *Id.* at 502 n.7. Nonetheless, we emphasized the "possibility that a narrow 'place' restriction might be more appropriately analyzed under intermediate scrutiny." *Id.*

In support of its argument that we should review the policy for a rational basis, the City draws a parallel between this case and our decision in *LULAC v. Bredesen*, 500 F.3d 523 (6th Cir. 2007). We fail to see any similarity. *LULAC* involved a Tennessee law that prohibited non-citizens and unlawful permanent residents from receiving or renewing their driver's licenses, but which did allow for the issuance of non-photographic driving certificates to non-resident aliens. *Id.* at 535. There, we held that "[a] state law implicates the right to travel when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right." *Id.* We reasoned that the driver's license law did not implicate the right to travel because it resulted merely in inconvenience, namely the need for non-resident aliens to carry multiple identification papers while driving. *Id.* "To the extent this inconvenience burden[ed] exercise of the right to travel at all, the burden [was] incidental and negligible, insufficient to implicate denial of the right to travel." *Id.* Because the infringement was at most minor, we affirmed the district court's analysis under the rational-basis standard. *Id.* at 235–36. By contrast, the primary purpose of the Beale Street Sweep was to impede travel, and it resulted in the broad denial of access to a popular, two-block area of a public roadway and sidewalk. This is much more than an incidental or negligible inconvenience; it clearly implicates the right to travel and should be subject to heightened scrutiny.

B.

As noted above, in *Johnson* we applied strict scrutiny because the drug-exclusion zone ordinance "impose[d] a more severe restriction" than "regulating the manner in which affected individuals access Over the Rhine (i.e., an anti-cruising ordinance), or the time of access (i.e., a curfew)" by "broadly prohibiting individuals to access the entire neighborhood, which

[Cincinnati] advertises as the largest national historic district in the nation, the City's fastest growing entertainment district and home to nearly 10,000 City residents." 310 F.3d at 502. The Beale Street Sweep, on the other hand, implicated a mere two-block stretch for limited periods of time between 3 and 5 a.m., typically on weekend mornings and sometimes after special events. Although the jury did not make a specific factual finding, it heard undisputed evidence that the MPD normally reopened Beale Street after the Sweep.[4] The evidence at trial established that around thirty minutes before the Sweep, MPD officers used flashing blue lights and a PA announcement to warn visitors that the street would be swept. Officers instructed visitors to either enter a business along Beale Street or leave the barricaded street area. Posted signs also indicated that the street would be cleared at 3 a.m. Visitors were not prohibited from patronizing businesses altogether, but they were temporarily cleared from the street and adjacent sidewalks. Accordingly, the Beale Street Sweep was considerably more limited in time and place than the broad drug-exclusion zone ordinance in *Johnson*.

Intermediate scrutiny is appropriate in this case.[5] The Beale Street Sweep has much more in common with the anti-cruising ordinance at issue in *Lutz* than the broad drug-exclusion zone ordinance in *Johnson*. It was limited in scope to a specific, two-block radius, and it was limited in time to specific two hours periods on weekend mornings and following special events. The

---

[4]None of the officers testified to the exact length of time that Beale Street was closed. However, several witnesses testified that the Sweep occurred at approximately 3:00 a.m. and the street was reopened most nights. Merchants were allowed to stay open until 5 a.m., suggesting that the Sweep typically lasted no more than two hours.

[5]At least one other court has applied strict scrutiny to intrastate travel restrictions, but that case is readily distinguishable. In *Embry v. City of Cloverport*, a district court applied strict scrutiny to a broad curfew ordinance making it "unlawful for any person to be on a street, alleyway, highway, roadway, sidewalk or any other public place in the city" from 12:00 midnight to 5:00 a.m. Sunday through Thursday and 1:00 a.m. to 5:00 a.m. on Friday and Saturday. No. 3:02CV-560-H, 2004 WL 191613, at *1 (W.D. Ky. Jan. 22, 2004). The regulation at issue in *Embry* is much broader in scope (all public places in the city) and in time (between four to five hours every night) than the Beale Street Sweep.

The Second Circuit has intimated that it would apply strict scrutiny to a similar curfew. In *Ramos v. Town of Vernon*, the court analyzed a juvenile curfew under intermediate scrutiny but observed in dicta that it would have reviewed the curfew for strict scrutiny had it applied to adults. 353 F.3d 171, 176 (2d Cir. 2003). As in *Embry*, the curfew was considerably broader in time and place than the Beale Street Sweep. *See id.* at 172 (making it unlawful for "any person under 18 years of age" "to remain idle, wander, stroll or play in *any public place or establishment in the Town*" from 11 p.m. to 5 a.m. on Sunday through Thursday and 12:01 a.m. to 5 a.m. on Friday and Saturday nights (emphasis added)).

policy appears to be exactly the type of "narrow 'place' restriction" the *Johnson* court contemplated would be appropriately reviewed under intermediate scrutiny. 310 F.3d at 502 n.7.

C.

Before assessing the Sweep under intermediate scrutiny, we first recognize two errors identified by the dissent. The dissent believes that the district court erred in subjecting the Beale Street Sweep to strict scrutiny and that the court compounded this error by asking the jury whether the City carried out its policy "without consideration to whether conditions throughout the Beale Street area pose[d] an existing, imminent, or immediate threat to public safety." (Slip Op. at 17–18.) (DE 141, Page ID 1899–1900.) In the dissent's view, the language of Jury Question 4, and therefore the jury's factual findings, are inextricably intertwined with strict scrutiny and can support a judgment under only that standard. (Slip Op. at 18–19.)

We generally "review[] a district court's jury instructions for an abuse of discretion." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1074 (6th Cir. 2015). We assess "whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *Id.* (quoting *Pivnick v. White, Getgey & Meyer Co.*, 552 F.3d 479, 488 (6th Cir. 2009)). "Erroneous jury instructions require reversal only if they are confusing, misleading, and prejudicial," not "where the error is harmless." *Id.* at 1074–75.

While the district court was incorrect to apply strict scrutiny in analyzing the Beale Street Sweep, that error was ultimately harmless. Jury Question 4's language did not require the City to meet a strict scrutiny standard, and even if so, the evidence adduced at trial and the jury's other factual findings support our conclusion that the Beale Street Sweep does not pass muster under either strict or intermediate scrutiny.

To survive intermediate scrutiny, the Beale Street Sweep must be "narrowly tailored to meet significant city objectives." *Lutz*, 899 F.2d at 270; *see Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir. 2003). Unlike strict scrutiny, however, intermediate review does not require that the practice be the "least restrictive or least intrusive means" of serving the government's objectives. *Neinast*, 346 F.3d at 594 (quoting *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 798 (1989)). Rather, "all that is required is 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Id.* (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)).

Under intermediate scrutiny, the City bears the burden of identifying a "significant" government interest that was furthered by the Beale Street Sweep.[6] *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014) (citing *Fox*, 492 U.S. at 480 (1989)); *see also Lutz*, 899 F.2d at 270. The City has identified public safety, which we have recognized as a "compelling" interest. *See, e.g.*, *Johnson*, 310 F.3d at 502. Therefore, the outcome-determinative question is whether the Beale Street Sweep bears a reasonably close relationship to the City's stated goal of public safety.

The jury found that MPD officers "carried out a custom and/or well-established practice mainly on weekends at or about 3:00 a.m. of preventing persons from standing and/or walking on the sidewalk or street of Beale Street" both prior to and after June 14, 2012. (*See* DE 141, Page ID 1899–1900.) This finding alone strongly supports the conclusion that the Sweep was not tied to public safety concerns but rather to a specific, arbitrary time on certain nights. Importantly, the City points to no evidence in the record showing that the decision to sweep Beale Street at or around 3 a.m. was in any way related to conditions or potential conditions on the ground, and the testimony of Arley Knight, a deputy chief with the MPD, precludes a presumption that the timing and execution of the sweeps was related to public safety. Knight observed that the City's policy was to sweep Beale Street at 3 a.m. "irrespective of emergencies." (DE 210, Page ID 2861.) Other officers also testified that the Sweep was a routine practice that occurred at 3 a.m. on weekend nights, regardless of conditions on the street. There were also signs posted around the area, noting that the street was cleared on weekend nights at 3 a.m.

---

[6]Because we conclude that intermediate scrutiny is appropriate and because the City bears the burden under that standard, we find no merit in the City's argument that the district court improperly shifted the burden of proof to the City in Jury Question 4. Under either strict or intermediate scrutiny, the City would have had to show that the Sweep furthered its stated goal of increased public safety. We also point out that the City likely waived this argument on appeal because it, in fact, agreed to the language used in Jury Question 4.

The jury further found that the sweep occurred "without consideration to whether conditions throughout the Beale Street area pose[d] an existing, imminent or immediate threat to public safety." (DE 141, ID 1900.)  Unlike the dissent, we do not believe that the language of Jury Question 4 improperly forced the City to prove that the Sweep was the least restrictive means of ensuring public safety on Beale Street.  While there is no doubt that, prior to trial, the district court concluded that strict scrutiny applied, Jury Question 4 simply asked the jury to determine, as a factual matter, whether the City took public safety into consideration in carrying out the Beale Street Sweep, not whether the practice was narrowly tailored to serve a compelling government interest.  While the jury's finding that the policy occurred notwithstanding "existing, imminent or immediate threat[s] to public safety" supports the conclusion that the policy fails strict scrutiny, it likewise supports a finding that the Sweep lacks the connection to public safety necessary to survive intermediate scrutiny.

Although we discern no error in the wording of Jury Question 4, even assuming the question imposed too high a burden on the City, any mistake was ultimately harmless. Under both strict and intermediate scrutiny, the City bore the burden of justifying the Sweep to its stated goal of public safety.  There is no indication in the trial transcript that the City lost at trial because it could not prove that the Sweep was the least restrictive means possible.  Rather, the evidence adduced at trial and the jury's factual findings show that the timing and execution of the Sweep policy was tied to an arbitrary time, not to existing conditions on the ground.  And without the requisite connection to public safety, the policy fails under intermediate scrutiny. Moreover, the error in the district court's analysis affected only its own legal analysis, not the reliability of the jury's factual finding.

### III.

Before the district court, Cole sought class certification based on either Rule 23(b)(2) or (b)(3) of a class comprised of "[a]ll persons who have been unlawfully removed from Beale Street and/or adjacent sidewalks by City of Memphis police officers pursuant to the custom, policy and practice known as the Beale Street Sweep." (DE 88, ID 780.)  The district court analyzed whether the proposed class satisfied Rule 23(a), and concluded that the class was sufficiently numerous, that there were common questions of law or fact, that Cole's claims

typified the class's claims, and that Cole and his counsel would fairly and adequately represent the interests of the class. The court went on to determine that although the proposed class did not satisfy Rule 23(b)(3), it did satisfy 23(b)(2). It observed that the "nature of the primary relief sought in 23(b)(2) class actions, injunctive or declaratory relief, does not require that the class be as narrowly confined as under either (b)(1) or (b)(3)." (*Id.* at 802 (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)) (brackets omitted).) In its order denying the City's motion to modify the class, the district court further noted that "the relief sought—an injunction against the further execution of the Beale Street Sweep—provide[d] a single remedy to protect all class members from future harm." (DE 160, Page ID 2060.) The district court adopted the approach of the First Circuit in *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972), where the court found that because 23(b)(2) classes do not require notice, class membership need not be precisely ascertained. Accordingly, the district court held that ascertainability of class membership was not a requirement for Rule 23(b)(2) certification.

The City argues on appeal that ascertainability is an implicit requirement for class certification, even classes certified pursuant to Rule 23(b)(2). It argues further that the inclusion of the word "unlawfully" in the class definition means that the probable membership of the class cannot be ascertained without case-by-case determinations. Cole responds that, pursuant to Rule 23(b)(2), the class sought and won a single remedy that will protect all class members from future harm, and that thus, ascertainability was not necessary for certification.

We review class-certification decisions for an abuse of discretion. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). "We will reverse the class certification decision . . . only if [the party opposing certification] makes a strong showing that the district court's decision amounted to a clear abuse of discretion." *Id.* "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012)). "We will not find an abuse of discretion unless we reach a definite and firm conviction that the district court committed a clear error of judgment." *Id.* (citation and internal quotation marks omitted).

Although Rule 23(a) has no express ascertainability requirement, many courts, including our own, have held that it is an implicit requirement of class certification. *See Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013); *Young*, 693 F.3d 532 (6th Cir. 2012). In *Young*, we adopted the ascertainability requirement noting that certification necessitated "a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 693 F.3d at 538; *see also Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 524–26 (6th Cir. 2015). However, *Young* involved a Rule 23(b)(3) class, 693 F.3d at 536, as have the other cases in which we analyzed this requirement. *See, e.g.*, *Rikos*, 799 F.3d at 524–26; *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014). Thus, whether ascertainability is a requirement for (b)(2) actions is a question of first impression in our court.

At least three of our sister circuits have held that "ascertainability" is inapplicable to Rule 23(b)(2). *Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015), *Shook v. El Paso Cnty.*, 386 F.3d 963 (10th Cir. 2004); *Yaffe*, 454 F.2d 1362. The Third Circuit, in *Shelton*, began its discussion of the requirement by noting that Rule 23(b)(2) and 23(b)(3) "create two remarkably different litigation devices." 775 F.3d at 560. Rule 23(b)(3) "allows class certification in a much wider set of circumstances" than (b)(2). *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011)). It is such an "adventuresome innovation" that Congress included additional "procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation omitted). For instance, Rule 23(b)(3) requires certifying courts to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). And unlike (b)(1) and (b)(2) classes, (b)(3) class members are entitled to notice and are able to opt-out of the class. *Id.* (c)(2)(B).

In the Rule 23(b)(3) context, ascertainability aids the inherent efficiencies of the class device by ensuring administrative feasibility, and as we read our own precedent and the precedent of other courts, ascertainability is a requirement tied almost exclusively to the practical need to notify absent class members and to allow those members a chance to opt-out and avoid

the potential collateral estoppel effects of a final judgment. *See, e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (noting that ascertainability "protects absent class members by facilitating the best notice practicable" and "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable"). But "the requirement that the class be defined in a manner that allows ready identification of class members serves several important objectives that either do not exist or are not compelling in (b)(2) classes." *Shelton*, 775 F.3d at 561. Since notice is not required for a (b)(2) class, the practical efficiencies that come with knowing the precise membership of the class are nonexistent. Likewise, without notice and an opportunity to opt-out, absent (b)(2) class members would not be estopped by a final judgment for the defense.

As discussed above, administering a (b)(3) class is a more procedurally complicated task than overseeing a (b)(2) class. *See Wal-Mart*, 564 U.S. at 362–63 ("When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether [a] class action is a superior method of adjudicating the dispute.") The main the purpose of a (b)(2) class is to provide relief through a *single* injunction or declaratory judgment. *Id.* at 360. "Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action." *Shelton*, 775 F.3d at 561.

The advisory committee's notes for Rule 23(b)(2) assure us that ascertainability is inappropriate in the (b)(2) context. *See* Fed. R. Civ. P. 23 advisory committee's note to amendment 1966. The committee's guidance states that (b)(2) is an appropriate device to use "even if [the action directed towards the class] has taken effect or is threatened only as to one or a few members of the class." *Id.* And the note further provides that "illustrative" examples of a (b)(2) class are civil-rights actions where members of the class "are incapable of specific enumeration." *Id.* As the Third Circuit reasoned, "[i]n light of this guidance, a judicially created implied requirement of ascertainability—that the members of the class be *capable* of specific enumeration—is inappropriate for (b)(2) classes." *Shelton*, 775 F.3d at 561.

Here, the plaintiffs seek a single remedy: an injunction prohibiting the City from reenacting the Beale Street Sweep. As the district court observed, this injunction provides the sole remedy necessary to protect the affected class. The precise identity of each class member need not be ascertained here, particularly given that notice is not required as it would be in a (b)(3) class. The decisions of other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.

## IV.

The City's final claim of error is there was insufficient evidence that the Beale Street Sweep was the "moving force" behind Cole's arrest. The City acknowledges that it failed to preserve this issue by failing to renew its Rule 50(a) motion for judgment as a matter of law as required by Rule 50(b). Accordingly, this issue is forfeited. *See, e.g.*, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 407 (2006); *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 583−84 (6th Cir. 2015) ("[F]ailure to renew a motion for judgment as a matter of law following the jury verdict forecloses a party's challenge to the sufficiency of the evidence." (internal quotation marks omitted)).

Even assuming the issue is preserved, it fails on the merits. "If there is any credible evidence to support a verdict, it should not be set aside." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990). At trial, Officer Williams testified that the MPD performed the Beale Street Sweep on the night of Cole's arrest and two officers, including one of Cole's arresting officers, Chris Bing, testified that Cole was arrested because he did not leave the street when the police told him to move. This is sufficient credible evidence to support the jury's express finding that the Beale Street Sweep "was the cause of Plaintiff Cole's unlawful arrest." (DE 141, ID 1903−04.)

## V.

For these reasons, we affirm the judgment of the district court.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. This appeal implicates the right to intrastate travel, "an important and largely unexplained area of constitutional jurisprudence." *Lutz v. City of York*, 899 F.2d 255, 256 (3d Cir. 1990). When our court last examined it, we declared the right fundamental but left open the question of whether strict or intermediate scrutiny governs laws burdening the right. *Johnson v. City of Cincinnati*, 310 F.3d 484, 496−98, 502 (6th Cir. 2002). Today, the majority and I agree that intermediate scrutiny is the appropriate legal standard for constitutional review of the City of Memphis's practice of sweeping Beale Street. However, the district court judge and district court jury applied the more onerous legal standard of strict scrutiny. Despite the error of law and misdirected findings of fact, my colleagues affirm. I respectfully disagree and thus dissent in part.

Unlike my colleagues, I conclude that a reasonable juror could have rendered a different verdict with the instructions framed correctly in terms of a *reasonable potential threat* to public safety—as opposed to the narrower and erroneous "existing, imminent or immediate threat to public safety." Here, applying the wrong legal standard of strict scrutiny, the district court relied wholly on the jury's factual findings in ruling that the practice is unconstitutional. Absent findings of fact addressing the material factors of intermediate scrutiny, we lack a sufficient factual basis to decide the case. I therefore respectfully dissent on the issue of whether the practice survives intermediate scrutiny. In all other respects, I concur in the majority opinion.

To survive intermediate scrutiny, a municipal practice must be "narrowly tailored to meet significant city objectives." *See Lutz*, 899 F.2d at 270; *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Unlike strict scrutiny, intermediate review does not require that the practice be the "least restrictive or least intrusive means" of serving the government's objectives. *See, e.g., Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 819−20 (6th Cir. 2005) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798−800 (1989)).

Under intermediate scrutiny, the burden is on the City to identify a "significant" government objective that the Beale Street Sweep is narrowly tailored to achieve. *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014) (citing *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)) ("The City bears the burden of showing the Policy satisfies [intermediate] scrutiny."); *see also Lutz*, 899 F.2d at 270. The City partially satisfied its burden by identifying its interest in protecting public safety, which we have recognized as a "compelling" interest. *See, e.g.*, *Johnson*, 310 F.3d at 502.

In this case, the outcome-determinative question is whether the City's practice was narrowly tailored to protect public safety. However, the district court instructed the jury using a different and more onerous standard and decided the case applying the wrong law. Because the jury's factual findings and the district court's legal ruling are inextricably intertwined and premised upon the incorrect legal standard of strict scrutiny, I would reverse and remand to the district court for further proceedings applying the correct law.

A remand is warranted because "[r]eversal is appropriate when the trial court 'applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact.'" *Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 577 (6th Cir. 2013) (citation omitted); *see also Siding and Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 901−02 (6th Cir. 2016); and *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717−20 (6th Cir. 2003).

In the district court, the City defended its sweep practice as furthering public safety, arguing that the City's decision to direct pedestrians to either enter a club or leave the street in the early morning hours "on some Saturday and Sunday nights is a narrow and reasonable intrusion" on individual rights, designed to "protect[] the safety of persons and property" on Beale Street. Applying strict scrutiny, however, the district court denied summary judgment in favor of the City on the grounds that there were genuine issues of material fact regarding the nature of the practice. Fact-finding was therefore necessary. At the subsequent trial, the district court required the City to prove that it did not carry out the challenged practice "unless [the] conditions throughout the Beale Street area pose[d] an *existing, imminent or immediate* threat to public safety." (Emphasis added.) The jury found as a matter of fact that the City failed to meet

this burden, and, on this basis, the district court entered an injunction ruling the practice unconstitutional under the legal standard of strict scrutiny.

The majority agrees that the district court erred in its jury instructions and application of the law. Under the correct legal standard of intermediate scrutiny, the government was not required to prove that its practice was the least restrictive means to protect public safety. Thus, a *reasonable potential risk* to public safety, as opposed to an "existing, imminent or immediate threat to public safety," was sufficient to justify a narrow time, place, and manner restriction like the Beale Street Sweep, which was limited to a two-block area for typically no longer than two hours in the early morning hours of some weekends.

As the City emphasizes, "Beale Street is a public roadway unlike any other" in the City of Memphis, the State of Tennessee, and perhaps the United States. By City ordinance, vendors may sell, and patrons may carry, alcoholic beverages on the sidewalks and street when the street is closed to motor traffic. *See* Tenn. Code Ann. § 57−4−102(27)(A)(iv); City of Memphis Ordinances §§ 7−4−15(C)(4), 7−8−23. Alcohol may be sold until 5:00 a.m. on Beale Street. *See* Tenn. Code Ann. §§ 57−4−102(27)(A), 57−4−203(d)(4). The City routinely uses barricades to restrict access to Beale Street, both to motor vehicle and foot traffic, and subjects patrons to identification and weapons checks.

Law enforcement is tasked every day with maintaining public safety on Beale Street among thousands of intoxicated persons concentrated in a two-block area with a history of disorderly conduct, stampedes, fights, sexual assaults, and gang violence. In that context, the City's decision to clear a two-block section of Beale Street for fewer than two hours in the early morning hours of some weekends may be narrowly tailored (just not the least restrictive means) to protect public safety. Moreover, the record demonstrates that the City did not carry out the practice every weekend morning. Rather, officers awaited a real-time determination by a supervisor to sweep "if the lieutenants felt like . . . *there was a need to [do] it*." (Emphasis added.) Deputy Chief Arley Knight of the Memphis Police Department testified that the practice was usually carried out between 3:00 a.m. and 5:00 a.m. on weekends because that was the time when they "felt [the police] were having the most problems." Rather than sweep Beale Street regardless of the conditions, Knight further testified that the practice was carried out at "the

discretion of [the supervising] lieutenant" and that "*the crowds dictated the safety*." (Emphasis added.) The jury's finding that this practice occurred "*mainly* on weekends at or about 3:00 a.m." (emphasis added) is consistent with the City's position.

Given Beale Street's unique context and history of incidents threatening public safety in the early morning hours, as well as the discretion that supervising officers exercised in carrying out the practice, a reasonable juror could have found that the City took into account reasonable potential threats to public safety. When I consider this possibility next to the limited time restriction (less than two hours on some weekends) and limited place restriction (two-block street), I disagree with the majority's decision to affirm on the grounds of harmless error.

Here, the district court's ruling is premised upon factual findings framed in terms of strict, as opposed to intermediate, scrutiny. Although not articulated in the majority opinion, my colleagues must conclude that the preserved constitutional errors did not affect the substantial rights of the City of Memphis. *See* Fed. R. Civ. P. 61. I respectfully disagree.[1]

As the district court previously ruled regarding the motions for summary judgment, genuine issues of material fact exist regarding the Beale Street Sweep at issue. In my view, the constitutional legal errors committed by the district court cannot be cured by the inappropriate fact-finding attempted by my appellate colleagues.

I would reverse and remand for further proceedings applying the correct law of intermediate scrutiny. In all other respects, I concur in the majority opinion.

---

[1]While the majority does not specify its standard of review for these preserved, constitutional errors, the errors certainly affect the City's substantial rights and are not harmless beyond a reasonable doubt. *See O'Neal v. McAninch*, 513 U.S. 432, 441−42 (1995); *Chapman v. California*, 386 U.S. 18, 24 (1967); *Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291, 303 (2007); and *United States v. Reid*, 751 F.3d 763, 767 (6th Cir. 2014) ("The civil and criminal harmless error rules after all spring from the same statute, use more or less the same language, and in general require courts to apply the same standard." (citation omitted).